JENNIE M. WENTWORTH
*vs.*
JOSEPH A. LAPORTE

York.    Opinion, October 3, 1960.

*Donald P. Allen,* for plaintiff.

*J. Armand Gendron,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, JJ.  SIDDALL, J., did not sit.

TAPLEY, J.    On exceptions and motion for new trial. The case is one of trespass in which the plaintiff alleges that the defendant occupied a portion of her real estate without right.  The parties agreed that should the jury find for the plaintiff, damages would be assessed in the sum of $50.00. The case was tried before a jury in the Superior Court for

the County of York. The jury verdict was in the plaintiff's favor in the sum of $50.00. That portion of plaintiff's property involved in these proceedings is located on the shore of Square Pond, so-called, in the Town of Acton, County of York and State of Maine, and is contiguous to the property of the defendant. The exact location of the westerly boundary of plaintiff's property is in question. The trial of the case brings squarely in issue the location of the town line between the Town of Shapleigh and the Town of Acton, as the various conveyances which are involved in this boundary dispute had their point of beginning at the town line separating the two towns. Defendant, through counsel, argues that the town line is approximately 100 feet easterly of where plaintiff says it is and, therefore, the division line between plaintiff's and defendant's properties would be approximately 100 feet easterly from the location as claimed by the plaintiff. The defendant admits he did the various acts as alleged in the pleadings and as shown by the proof but argues that they were not in the nature of trespass as they were performed on his property.

### MOTION FOR NEW TRIAL

Establishment of the line between Acton and Shapleigh was authorized by a Legislative Act in the year 1830 (Chap. 79, P. S. Laws) and is entitled "An Act to Incorporate the Town of Acton." The portion of the enactment pertinent to this issue reads as follows:

> "Be it enacted by the Senate and House of Representatives in legislature assembled, that from and after the 7th day of March in the year of our Lord one thousand eight hundred thirty so much of the Town of Shapleigh in the County of York as lies west of the following described line, namely, beginning at the point of intersection of the west line of the fifth range of lots in said Shapleigh with the northerly line of the town of Sanford; thence running north on said range line to the north check

> line of lot No. 2 in said fifth range; thence east on
> said check line to the east side line of said fifth
> range; thence north on said range line to Long
> Mousam Pond; thence northerly up said Pond to
> the mouth of Hubbard's Brook; thence up said
> Brook to the east line of the sixth range; thence
> north on said range line to Square Mousam Pond."

That part of the town line which runs from the Stiles Road (sometimes called Goose Pond Road) to Square Pond is concerned in this trespass action. The property of which plaintiff claims ownership was deeded to her husband in July of 1923. Title came to her through the last will and testament of her husband, which was proved and allowed in the Probate Court at Alfred in June of 1930, so the ownership of the property has been in the plaintiff and her husband since 1923. The defendant comes by his title through a conveyance from Goodall Brothers (a corporation) by deed dated December 29, 1922.

In June of 1850 the Selectmen of the Towns of Shapleigh and Acton perambulated the line between the Towns of Acton and Shapleigh and recorded their findings in the Acton Town Records as follows:

> "The undersigned, Selectmen of the towns of
> Shapleigh and Acton did on the twenty-fourth day
> of June A. D. 1850, meet on the line between said
> towns at the south west corner of Shapleigh and
> south east corner of Acton, being the southwest
> of lot No. 1 in the fifth range of lots in said town
> of Shapleigh, which said corner is about seven-
> teen links southerly from *from* a scissure or di-
> vision in a certain large rock lying mostly in the
> ground, and in the line between said towns as fol-
> lows, to wit: North by the west side line of said
> fifth range of lots in Shapleigh to long Mousam
> pond, and received the spots on the ancient spo*t*ed
> trees, at the bridge leading over Long Mousam
> pond aforesaid (called Roger's bridge) we estab-
> lished said line at twenty two feet northerly from

the southerly rock abutment of said bridge and twelve feet southerly from the northerly rock abutment of said bridge. We took the line at Hubbard's brook, so called, it being nine rods and three forths south from a certain white maple stump marked S. A. which said stump is about eight feet north-west from a certain dead white maple tree marked S. and run north by the ancient marked trees to square Mousam pond, at a certain white maple tree marked S.A. and the figures 1834. From the head of square Mousam pond, at six feet west of a small pitch pine tree lettered S. and A. we run north by the side line of the sixth range of lots in said Shapleigh to Little Ossipee river and on the lines aforesaid we have set up stone monuments as follows, to wit. one at the southwest corner of Shapleigh and southeast corner of Acton, one at each of the crossings of the highways, one near the western bank of Long Mousam pond, one at the angle by Hubbard's brook, one near the south bank of square Mousam pond, one near the banks on the north end of said pond and one near the bank of Little Ossipee river."

Mr. Dow, an engineer, in 1929 was employed to run the town line between the Towns of Shapleigh and Acton, from Sanford to Square Pond. Mr. Dow based his survey on the Acton record which is quoted above and ran from monument to monument, as identified in the 1850 report. The monuments referred to were one at the Stiles Road marked S-A and one near Square Pond similarly marked S-A. He testified that in making the survey for use in this case he found it to coincide with the survey of 1929. The evidence establishes that the titles of both the plaintiff and defendant sprung from a common owner and the various deeds show description-wise that the town line is involved either as a line to which other lines are parallel thereto, or in some circumstances where the point of beginning is "118 feet westerly from a stone post set in the line of Acton and Shapleigh and marked S-A." There is another deed, for

instance, that describes the point of beginning "on the Shapleigh and Acton Town Line at a point 75 feet south of a stone post marked S-A in said line." This stone post becomes material in one way or another insofar as a determination of boundaries are concerned. Mrs. Wentworth, the plaintiff, in her testimony concerning the stone marker which is a granite post marked S-A, in speaking of the time when she first noticed it, said,

"Q. Mrs. Wentworth, can you recall and tell the jury when it was the first time you ever saw the marker?
A. Well, it was in 1909 when we went up there to pick out the lot, the first time we noticed it."

Mrs. Wentworth further identifies the marker in relation to the distance between it and the dividing line between her lot and that of the defendant's, Mr. LaPorte:

"Q. Now, do you understand the situation here sufficiently to tell us how far it is in feet from this stone which is marked A-S to the line which divides your property from the property of Mr. LaPorte?
A. It is supposed to be 300 feet.

Q. So, on this sketch, your understanding is that this line here which divides your property, the westerly line of your property, from the property of Mr. LaPorte is 300 feet westerly of the stone marked A-S?
A. Yes."

(It is to be noted that the letters A-S and S-A have been used in this case interchangeably.)

Mr. Bland, witnessing for the plaintiff, when inquired of relative to the marker, testified:

"Q. Mrs. Wentworth's camp is westerly of yours?
A. Yes.

Q. Can you tell the Court whether or not there is any stone post or marker located nearby your camp or cottage building?

A. There is a stone post right between my camp and Cooper's.

Q. By 'Cooper's' camp, are you referring to a camp which is easterly of your camp?

A. Yes.

Q. Will you describe that stone post?

A. Well, it is about four feet high and it has 'S and A' marked on it.

Q. Is it a square post?

A. Yes.

Q. Is it embedded in the ground?

A. Yes, it is.

Q. And when did you acquire your camp property?

A. I think it was 1918.

Q. And from whom did your purchase?

A. Roy Downs; well, my mother bought this camp and then it passed on to me.

Q. At the time you brought this camp building in on to this lot at Square Pond, was that marker you have just described located on the lot?

A. Yes.

Q. Would you say it was located in exactly the same location as it is today?

A. Yes, right in the same place ever since I have known it.

Q. And when you say since you have known its location, how far back in time does that knowledge reach?

A. 1918.

Q. And you say of your own knowledge that that post has never been moved?

> A.  Not that I know of. It has been right there
>     in the same place."

Mr. Frank W. Clark, a surveyor, identifies the marker. His knowledge of the area dates back to 1898. In 1905 he assisted in running a line, using this marker as a point. The selectmen of the Towns of Shapleigh and Acton, on the twenty-fourth day of June, 1850, in perambulating the line between the two towns, reported taking the line at Hubbard's Brook, so-called, and running it "north by the ancient marked trees to Square Mousam Pond at a certain white maple tree marked S. A. and the figures 1834." They further recorded that they set stone monuments "one at the southwest corner of Shapleigh and southeast corner of Acton, one at each of the crossings of the highways, one near the western bank of Long Mousam Pond, one at the angle by Hubbard Brook, one near the south bank of Square Mousam Pond \*\*\*\*\*\*." It is reasonable to deduce from this report that the white maple tree marked S-A and with the figures 1834 was replaced in 1850 by the monument which now stands and has been identified by witnesses as being that one near the Cooper place.

There were two surveyors who testified as plaintiff's witnesses, one, Mr. Frank W. Clark and the other Mr. Neil M. Dow. Mr. Clark, as a result of his survey, drafted a plan of the locus identified as Plaintiff's Exhibit 6, and Mr. Dow made a plan based on his survey which is identified as Plaintiff's Exhibit 19.

The defendant claims the engineers were in error in placing the town line as they did and further argues that the town line when originally determined was not in accordance with the direction of the Legislature.

We have noted heretofore that the Town of Acton was incorporated by the Private Laws of 1830. Sometime after the legislative enactment, and before 1850, action was taken

to define the town lines as the Selectmen's Report of 1850 refers to "Ancient marked trees" which they either replaced by monuments or they renewed spots on the ancient trees. It is obvious from the evidence that the town line in this area, at least, has stood in its present position for well over one hundred years.

In analyzing this case and the legal problems it presents, it is important to keep in mind that the line which is the focal point of the controversy is not disputed by the two towns but its location is questioned by counsel for the defendant as a defense measure. There is nothing in the evidence to indicate other than that the defendant, Mr. La-Porte, when he purchased the property in 1922, or the plaintiff's predecessor who purchased in 1923, had any question but that the boundaries of their respective properties were in accordance with the town line. This is also true as to their predecessors in title.

The stone post bearing initials S-A which replaced the ancient marker of a white maple tree marked S. A. and with the figures 1834 located near the Cooper place stands as a monument which is material in pointing the way to a determination of this controversy.

In the case of *Whitcomb* v. *Dutton,* 89 Me. 212, the question arose between individuals as to the location of a town line. Previous to the action a controversy had existed as to the location of this town line between the Towns of Morrill and Waldo. In accordance with statutory provisions, commissioners were appointed who proceeded to ascertain and determine the disputed line and place suitable monuments for the permanent establishment of the line. At the trial of the case one side argued the acceptance of the line found by the commissioners while the other urged that the original line was the correct one. Plaintiff introduced testimony of a surveyor which disputed the line as found by the commis-

sioners. The jury returned a plaintiff verdict. In speaking about the effectiveness of monuments in determining lines, the court, on page 218, said:

"If the locations of these monuments could be established and they indicated a line varying from the one described by course, the monuments would control, the course must yield; but if the monuments cannot be found or their locations established, then resort must be had to the course as the only other description of the boundary given in the charters. The identity of these monuments, and the places where they were originally located, being in dispute, were questions of fact for the jury."

It is to be noted at this juncture that the surveyors testifying for the plaintiff in the instant case set their course from the monument at the northerly edge of Stiles Road, so-called, to the monument near the Cooper place. These monuments were set in 1850 and have stood for over one hundred years as monuments of the separation of the two towns and from one to the other was determined of course which bounded the towns on the one side and the other.

"And from their well known experience and legal knowledge we presume that to the facts as they found them evidenced by ancient marks upon the face of the earth, they applied the well settled principle of law, that where the line described in a deed or charter, and that indicated by monuments established in the original survey and location of the tract or township, do not correspond, the latter, being the best evidence of the true line, must govern, however they may differ."

*Inhabitants of Bethel* v. *Inhabitants of Albany, et al.*, 65 Me. 200, at page 202.

"In construing a deed, the first inquiry is, what was the intention of the parties? This is to be ascertained primarily from the language of the deed. If this description is so clear, unambiguous, and cer-

tain, that it may be readily traced upon the face of the earth from the monuments mentioned, it must govern; but when, from the courses, distances, or quantity of land given in a deed, it is uncertain precisely where a particular line is located upon the face of the earth, the contemporaneous acts of the parties in anticipation of a deed to be made in conformity therewith, or in delineating and establishing a line given in a deed, are admissible to show what land was intended to be embraced in the deed. It is the tendency of recent decisions to give increased weight to such acts, both on the ground that they are the direct index of the intention of the parties in such cases, and, on the score of public policy, to quiet titles."

*Knowles* v. *Toothaker,* 58 Me. 172, at page 175.

There is uncontradicted evidence the defendant recognized that his deed did not vest title in him to that portion of the Wentworth property which he was making use of. Mrs. Wentworth testified:

"A.  Well, my nephew and I went to his camp to talk with him to see how he felt about the survey and see if he would agree to it so that we could straighten our line out and everyone know where we stood, and he wouldn't listen to anything. My nephew talked to him very nicely and he wouldn't listen to anything. He knew everything himself, and finally when we come out I asked Mr. LaPorte, 'Who do you think owns that land down there where you are parking your car?' Mr. LaPorte, said 'You do, Mrs. Wentworth, but I can take it by squatter rights.' That is just the conversation; I remember it distinctly, and that was about eight o'clock in the evening of August 23, 1952."

The case went to the jury, not on the question of the dispute of the town line between towns, but on the basis of a controversy between land owners as to their respective

boundaries. A portion of the town line lying between two granite monuments of ancient vintage, with one of them being specifically designated as a starting point in the chain of title to both properties, is pertinent and germane to the issue of the boundaries of both parties. The record shows that not only the property of these litigants is affected by this portion of the town line but also there are other land owners whose descriptions tie in to the monument and the town line. It is reasonable to deduce from the evidence that both the plaintiff and the defendant since 1922 and 1923 respectively, when their property was acquired, had no thought other than that the monument near the Cooper place and the location of the town line as contended by the plaintiff was the true line where their respective chain of title started. This appears to be true until litigation was commenced by the plaintiff. The location of the town line as affecting the boundaries of the properties of the litigants, in light of the descriptions in their deeds of conveyance and their respective chains of title, is a jury question.

A careful review of all the evidence, oral testimony, deeds and plans, leads us to the conclusion that there was sufficient credible evidence upon which the jury based its verdict.

Defendant took exceptions to certain portions of the charge of the presiding justice and also to the refusal to instruct. These exceptions we have considered and, finding no error in the charge and refusal to instruct, the exceptions are overruled.

*Exceptions overruled.*

*Motion for new trial denied.*